UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Crim. No. 09-103(DSD/SRN) |
| Plaintiff, | |
| v. | **REPORT &** <br> **RECOMMENDATION** |
| Samuel Johnson Ewing, | |
| Defendant. | |

Nate Petterson, Office of the United States Attorney, 300 South Fourth Street, Suite 600, Minneapolis, Minnesota 55415, for Plaintiff United States of America

Andrea George, Office of the Federal Defender, 107 United States Courthouse, 300 South Fourth Street, Minneapolis, Minnesota 55415, for Defendant[1]

SUSAN RICHARD NELSON, United States Magistrate Judge

The above-captioned case comes before the undersigned United States Magistrate Judge on Defendant's Motion to Suppress Eyewitness Identifications (Doc. No. 16); Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Doc. No. 18); and Motion to Suppress Statements, Admissions and Answers (Doc. No. 19).

This case has been referred to the undersigned for resolution of pretrial matters pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1.[2]

---

[1] During a portion of the hearing on these motions, Defendant chose to represent himself. He later reconsidered his decision and elected to be represented by his previously-appointed counsel, Federal Defender Andrea George.

[2] The Court has addressed Defendant's non-dispositive motions in a separate Order.

I.   **FACTUAL BACKGROUND**

Defendant is charged with armed robbery of a credit union, in violation of 18 U.S.C. §§ 2113(a) and (d), and brandishing a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(ii).  (Indictment, Doc. No. 9.)  Testifying at the criminal motions hearing were Officer Matthew Swenke, West St. Paul Police Department; Investigator Corey Thomas, Inver Grove Heights Police Department; Special Agent Joseph Malhoit, FBI.   Government Exhibit 1, a transcript of Defendant's interview with Investigator Thomas on March 26, 2009, was offered and received in evidence.  Defendant offered no exhibits.

   A.   **Officer Swenke's Testimony**

Officer Matthew Swenke of the West St. Paul Police Department, testified that on March 26, 2009, at approximately 10:17 a.m., he received a police dispatch alerting him to an armed robbery at a temporary employment agency, Top Temporary, 2055 South Robert Street, West St. Paul, Minnesota.  The suspect was described as an adult black male wearing a black Carhartt jacket, armed with a handgun.

As Officer Swenke responded to the dispatch, activating the emergency lights and siren of his unmarked squad car, he approached a Dodge Dakota pickup driven by an adult black male, wearing a black jacket.  Officer Swenke made a u-turn to follow the pickup, believing the driver to be the robbery suspect.  As he conducted the u-turn, the driver of the pickup crashed into a utility pole, then fled on foot.  Officer Swenke yelled, "Stop!  Police!" and followed the suspect. He observed that the suspect was carrying a cream-colored bag, but did not see him brandishing a handgun.  As he pursued the suspect, Officer Swenke continued to identify himself as a police officer and ordered the suspect to stop.  Officer Swenke followed the suspect into a wooded area,

and when the suspect stumbled 2-3 times, Officer Swenke apprehended him. Officer Swenke handcuffed the suspect, placed him under arrest and performed a pat search to determine if the suspect possessed a weapon. He touched an object in the suspect's sleeve that felt like a plastic bag containing currency, but he did not remove it at that time, as he lacked any means of collecting it.

During his testimony, Officer Swenke identified Defendant as the person whom he pursued and arrested. Officer Swenke also learned of the credit union robbery shortly after Defendant was arrested and secured in a squad car. Officers conducted a more complete search after Defendant was placed in a squad car, discovering a large amount of cash in the plastic bag. Officer Swenke and another officer retraced the route of flight from the pickup truck and located a handgun in a residential backyard, south of where Defendant had crashed the vehicle. Officer Swenke also testified that he learned that the pickup had been stolen a few days before the March 26, 2009 credit union and temporary agency robberies.

### B. Investigator Thomas's Testimony

Investigator Corey Thomas, Inver Grove Heights Police Department, testified that on March 26, 2009, he heard a report of the Top Temporary robbery over his radio and immediately headed in that direction. When he arrived at the scene, he observed that a pickup truck had crashed into a utility pole and a suspect, whom Investigator Thomas identified as Defendant, had been apprehended.

As to the pickup truck, Investigator Thomas testified that the vehicle had been stolen two days earlier in West St. Paul, in connection with a robbery at Mattress Giant, where the vehicle was parked.

Investigator Thomas testified that he and West St. Paul Police Investigator Kevin O'Neal interviewed Defendant later that morning at the West St. Paul Police Department. The interview was recorded and a transcript of the interview was admitted as Government Exhibit 1. Investigator Thomas advised Defendant of his Miranda rights and Defendant indicated that he understood his rights, but nevertheless agreed to talk to the officers. Investigator Thomas testified that neither he nor Investigator O'Neal made any threats or promises in order to induce Defendant to speak during the approximately 35-minute interview. According to Investigator Thomas, throughout the interview, Defendant was preoccupied with the whereabouts of a bag and its contents, believed to have been in the pickup. Defendant requested that the officers retrieve the bag and ultimately terminated the interview, stating that he would not continue the interview until the bag was brought to him.

### C. Special Agent Malhoit's Testimony

Special Agent Joseph Malhoit, FBI, testified that when he was informed of the credit union robbery, he proceeded to Heartland Credit Union, 5500 South Robert Street in Inver Grove Heights. At the credit union, another officer informed Special Agent Malhoit that officers had arrested a suspect – Defendant – and he was in custody. Special Agent Malhoit also learned that Defendant had been interviewed and gave a confession, although he did not recall if he spoke to the officers who conducted the first interview.

Approximately one hour after the first interview, Special Agent Malhoit conducted an interview of Defendant to determine if he had been involved in other unsolved bank robberies in the area. Special Agent Malhoit testified that he reminded Defendant of his Miranda rights and told Defendant that he could end the interview at any time, but he neither formally reread the

4

Miranda rights, nor obtained a new waiver. Defendant agreed to speak with Special Agent Malhoit. During the interview, Defendant admitted that he took the gun used in the robberies from someone else and he claimed no involvement in the other unsolved bank robberies. The interview lasted approximately 10 minutes and Special Agent Malhoit testified that he did not make any threats or promises to Defendant, nor did Defendant request an attorney. Special Agent Malhoit terminated the interview.

### D. Government Exhibit 1

In the transcript of the March 26, 2009 interview of Defendant, Government Exhibit 1, Defendant waived his right to counsel and acknowledged that he understood his Miranda rights, which Investigator Thomas read to him. In the transcript, Defendant admits to having committed the robberies at Mattress Giant, Top Temporary and the credit union. As noted in the testimony of Investigator Thomas, Defendant was concerned about the whereabouts of a bag throughout the interview. It appears that the bag may have contained legal pleadings related to a civil lawsuit that Defendant claimed to have filed against the State of Minnesota. Defendant wished to show the interviewing officers the materials, which he discussed during the interview. When the officers did not produce the bag, Defendant eventually ceased the interview. The officers ended the questioning as soon as Defendant stated that he did not wish to continue until the bag appeared.

### E. Eyewitness Identification

The credit union robber wore a ski mask at the time of the robbery, therefore no one was able to see his face. Following the robbery, a bank employee was brought in for a "show-up" identification and identified Defendant as the person who committed the robbery.

## II. DISCUSSION

### A. Suppression of Eyewitness Identifications

The Government avers that it will not introduce evidence of the "show-up" identification procedure and will not seek an identification by that witness at trial. Accordingly, because no eyewitness identifications will be used, Defendant's motion to suppress such identifications should be denied as moot.

### B. Suppression of Evidence Obtained as a Result of Search and Seizure

This case involves evidence seized from Defendant pursuant to a search of his person; evidence that Defendant discarded prior to his arrest; and evidence seized from the stolen pickup pursuant to a search warrant. Defendant moves to suppress the physical evidence, arguing that the search warrant was issued without probable cause and was issued in error and that the warrant was executed in an illegal and unlawful manner and not in good faith. Defendant also argues that any other searches and seizures were conducted without a warrant, without probable cause and lacked a showing of exigent circumstances.

In Terry v. Ohio, 392 U.S. 1 (1968), the Supreme Court held that a police officer may stop and briefly question a person if the officer has a reasonable and articulable suspicion that the person has committed or is about to commit criminal activity. Id. at 21-24. A reasonable, articulable suspicion means that there are specific and articulable facts, and rational inferences drawn from those facts, reasonably suggesting that criminal activity has occurred or is imminent. Id. at 21. Police can sometimes consider otherwise innocent behavior in determining whether reasonable suspicion exists to detain a person. See id. at 22-23. Specifically, police observation of an individual, fitting a police dispatch description of a person involved in a disturbance, near

in time and geographic location to the disturbance establishes a reasonable suspicion that the individual is the subject of the dispatch. See United States v. Juvenile TK, 134 F.3d 899, 904 (8th Cir.1998) (affirming reasonable suspicion determination when police spotted defendant's car, which matched police dispatch description, no more than two blocks away from the scene of the robbery and within five minutes of a second police dispatch concerning the robbery).

Officer Swenke had a reasonable and articulable suspicion of criminal activity. He received a police dispatch that an adult black male wearing a black Carhartt jacket was suspected in a robbery at Top Temporary, located at 2055 South Robert Street in West St. Paul. Immediately, he traveled in that vicinity and observed Defendant – an adult black male, wearing a black Carhartt jacket – at the intersection of 55th Street and Alta Avenue. When Officer Swenke executed a u-turn in order to stop and briefly question Defendant, Defendant crashed and abandoned the pickup, running away on foot, despite Officer Swenke's repeated commands that he stop. "Nervous, evasive behavior is another pertinent factor in determining reasonable suspicion, e.g., United States v. Brignoni-Ponce, 422 U.S. 873, 885 (1975), and headlong flight is the consummate act of evasion." Illinois v. Wardlow, 528 U.S. 119, 120 (2000). As the Supreme Court held in Wardlow, the officer in that case was justified in suspecting that Wardlow was involved in criminal activity when he fled, and, therefore, in investigating further:

> While flight is not necessarily indicative of ongoing criminal activity, Terry recognized that officers can detain individuals to resolve ambiguities in their conduct and thus accepts the risk that officers may stop innocent people. If they do not learn facts rising to the level of probable cause, an individual must be allowed to go on his way. But in this case the officers found that Wardlow possessed a handgun and arrested him for violating a state law.

Wardlow, 528 U.S. at 119. Defendant's flight is therefore another factor in finding reasonable

7

suspicion.

Once he had apprehended Defendant, Officer Swenke conducted a limited pat-down search for weapons. He testified that he conducted the search to determine if Defendant had a weapon. A police officer may make a limited warrantless search in order to discover weapons if the officer has a reasonable, articulable suspicion that a person might be armed and dangerous. See, e.g., Terry, 392 U.S. at 1. The test under Terry is an objective standard: the officer need not be absolutely certain that the suspect is armed, but must establish that a reasonably prudent man in the circumstances would be warranted in the belief that his safety or the safety of others was in danger. United States v. Roggeman, 279 F.3d 573, 577-78 (8th Cir. 2002) (citations omitted). "The sole justification of the search . . . is the protection of the police officer, and it must therefore be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." Terry, 392 U.S. at 29. Any weapons found may be seized and may be introduced in evidence against the person from whom they were taken. Id. at 29-30.

In examining whether the facts and circumstances surrounding a Terry search support an officer's "reasonable suspicion," of weapons, courts examine the totality of the circumstances. Roggeman, 279 F.3d at 578. Here, for the reasons discussed above, the facts and circumstances of the pat-down search support the officer's reasonable suspicions that Defendant was armed. Officer Swenke was responding to a report of an armed robbery. In light of the totality of the circumstances, he had an objective, reasonable suspicion justifying the pat-down search of Defendant's person. The evidence obtained on Defendant's person should not be suppressed.

As to the evidence that Defendant discarded during the footchase – i.e., the gun – a

8

"seizure" occurs only when a citizen is physically touched by law enforcement officers or when he otherwise submits to a show of authority by the officers. California v. Hodari D., 499 U.S. 621, 626 (1991). An assertion of authority by a law enforcement officer without a corresponding submission by the citizen does not constitute a seizure within the meaning of the Fourth Amendment. Id. at 626; Schulz v. Long, 44 F.3d 643, 647 (8th Cir.1995). Even if an officer's pursuit of a fleeing suspect constitutes a "show of authority," where the suspect fails to comply with an order to halt, he is not "seized" until physically apprehended. Hodari D., 499 U.S. at 629 (holding that cocaine abandoned while the defendant was running was not the fruit of seizure and should not have been suppressed).

In this case, when Officer Swenke attempted to approach Defendant by making a u-turn, Defendant crashed the stolen pickup, abandoned it, then fled on foot. Although Officer Swenke repeatedly shouted, "Stop! Police!" Defendant ignored that command and fled. Because Defendant did not submit to authority in any sense of the phrase, he was not seized at that time. Only when he stumbled and Officer Swenke caught up with him was Defendant seized, because it was at that point that police physically touched him. The gun abandoned during the chase is therefore not the fruit of an illegal seizure and should not be suppressed.

Regarding the evidence found pursuant to the issuance of a search warrant of the pickup, during the portion of the criminal motions hearing when Defendant proceeded pro se, he stated that he was not challenging the search of the stolen pickup.[3] Even if he were, the Court finds that he has no privacy interest in the truck. A defendant has standing to challenge the admission

---

[3] In light of Defendant's representation, the Government did not move for the admission of the search warrant as an exhibit.

9

of illegally obtained evidence only if the defendant's own constitutional rights have been violated. See Rakas v. Illinois, 439 U.S. 128, 134 (1978). The Supreme Court has held that a person's Fourth Amendment rights are not infringed if that person "is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property." Id. at 134. In Fourth Amendment challenges, whether a defendant has standing depends on whether he had a subjective and reasonable expectation of privacy in the area searched or the items seized. See Minnesota v. Carter, 525 U.S. 83, 91 (1998). The person challenging the search bears the burden of establishing a subjective expectation of privacy and that the expectation is objectively reasonable, i.e., one that society is willing to expect. See Minnesota v. Olson, 495 US. 91, 96-97 (1990).

Society is not willing to expect a privacy interest in a stolen vehicle. Defendant admitted that he took the pickup from a Mattress Giant employee at gunpoint. Absent an ownership interest in the vehicle, "the defendant must present at least some evidence of consent or permission from the lawful owner/renter to give rise to an objectively reasonable expectation of privacy." United States v. Muhammad, 58 F.3d 353, 355 (8th Cir.1995) (citations omitted); see also United States v. Ponce, 947 F.2d 646, 649 (2d Cir.1991), cert. denied, 503 U.S. 943 (1992); United States v. Sanchez, 943 F.2d 110, 114 (1st Cir.1991). As Defendant has presented no evidence of consent or permission from the truck's owner, he therefore possessed no privacy interest in the stolen truck. Accordingly, he should be prohibited from challenging the legality of its search and his motion to suppress should be denied.

C. **Suppression of Statements, Admissions and Answers**

Defendant moves to suppress the second statement that he made on March 26, 2009,

arguing that it was made in violation of his Fourth, Fifth and Sixth Amendment rights. Defendant, however, does not move to suppress the first statement made to Investigators Thomas and O'Neal. At the end of his first statement, Defendant stated that he did not wish to continue speaking with the investigators until he received his bag. The questioning promptly ceased and in about one hour, FBI Special Agent Malhoit arrived to interview Defendant. Although he did not re-Mirandize Defendant or obtain a second Miranda waiver, Special Agent Malhoit reminded Defendant that the rights he had been given approximately one hour earlier still applied and informed him that he could end the interview at any time. Defendant agreed to speak with Special Agent Malhoit and again admitted to robbing the bank and made other incriminating statements in the second interview.

The Supreme Court announced in Miranda v. Arizona, 384 U.S. 436, 473 (1966), that "[i]f the individual indicates in any manner, at any time prior to or during questioning that he wishes to remain silent, the interrogation must cease." In Michigan v. Mosley, 423 U.S. 96 (1975), however, the Court noted that Miranda does not "create a per se proscription of indefinite duration upon any further questioning by any police officer on any subject, once the person in custody has indicated a desire to remain silent" id. at 102-03, and holds: "There is no reason ... to rob the accused of the choice to answer questions voluntarily for some unspecified period of time following his own previous contrary decision." Id. at 111. The Court in Mosley held that the "admissibility of statements obtained after the person in custody has decided to remain silent depends under Miranda on whether his right to cut off questioning was 'scrupulously honored.'" Id. at 103-04 (citation omitted).

In Mosley, the Supreme Court relied on three factors to determine whether the police had

scrupulously honored the defendant's right of silence: (1) whether the police immediately ceased the interrogation upon defendant's request; (2) whether they resumed questioning only after the passage of a significant period of time and provided a fresh set of Miranda warnings; and (3) whether they restricted the later interrogation to a crime that had not been the subject of the first interrogation. Id. at 106.

Before analyzing whether Defendant's right to remain silent was scrupulously honored, we must first determine whether he made a decision to remain silent as prescribed in Miranda and Mosley. See United States v. Thompson, 866 F.2d 268, 271 (8th Cir. 1989), cert. denied, 493 U.S. 828 (1989). At the outset of the first interview, after the investigators read Defendant his rights, the following exchange occurred:

> Q: Samuel, do you understand each of these rights I've explained to you?
> A: Yes, sir, I do.
> Q: Okay, having these rights in mind, do you wish to talk to us now?
> A: Ah - only if my, ah, yeah, only if the commission, um, Chief of Police is present. Well, I'll talk to ya'll anyway, but yes –
> Q: You will? Okay. The Chief is around and he's probably listening a little bit, you know here and there but, ah, if there's something that demands his attention, I could probably find him but just to be clear, having these rights in mind, do you wish to talk to Kevin and myself right now?
> A: Ahmm, only if you all get the case that was outta my property?
> Q: Yes, I can guarantee you we will get everything that was in the truck – and if your case is in there, we would definitely have that – cuz apparently you wanta talk about that case –
> A: That's why –
> Q: What's in the case?
> A: Right, that's why I did that – that's why I committed the crime, sir –
> Q: Oh, okay. Well that makes –
> A: I'm a criminal, I'm a criminal, I'm an ex-criminal, I just finished parole (inaudible).
> Q: Okay, okay, ah and I don't wanta keep hammering this, but I just have to ask you, will you talk to Kevin and I now?
> A: Yes, I will talk to ya'll –
> Q: You will talk to us? Okay. . . . .

(Govt. Ex. 1 at 1-2.) While Defendant does not move to suppress this first interview, the Court notes that Defendant initially made his willingness to talk conditional on the presence of the local chief of police, yet reversed that decision immediately. When asked once again if he agreed to talk to the investigators, Defendant made his agreement contingent upon them producing his case. The bag was not produced, however, he continued to talk. Finally, when the investigators asked a third time if he wished to speak with them, he agreed, saying, "Yes, I will talk to ya'll." The interview proceeded.

Near the conclusion of the interview, the investigators asked about Defendant's possible involvement in a similar robbery in Eagan, Minnesota. Defendant disavowed involvement in that robbery and stated that he would say nothing more until his bag was produced to him:

> D: Matter fact, I'm not gonna say nothing, you can stop the tape –
> I: Okay.
> D: And, and and put it off "record" until until the ah until that bag get here –
> I: Okay.
> D: You know because –
> I: You don't wanta talk anymore at this point?
> D: Until – until the bag here, that way I can sign and write –
> I: Okay.
> D: whatever down, what you want – .

(Govt. Ex. 1 at 25.)

In deciding if the right to remain silent was asserted, we must consider all that Defendant said after the warnings were given. Thompson, 966 F.2d at 271. In Thompson, the Eighth Circuit held that even if the defendant's statements that he would "sleep on it" before being interviewed and would talk "tomorrow" constituted an invocation of his right to remain silent (the court held that the statements were insufficient to invoke the right to silence), he subsequently reversed that invocation by stating in response to an agent's request for routine

13

personal information, that he would "wait a little while before I'm interviewed." Id.; see also United States v. Al-Muqsit, 191 F.3d 928, 936-37 (8th Circuit 1999) (The defendant did not invoke his right to remain silent by stating that he "wasn't ready to talk about" the crime at that time or when he later stated, "I don't think right now."), vacated, in part, on other grounds, United States v. Logan, 210 F.3d 820 (8th Cir. 2000). Here, Defendant ultimately made the decision to stop talking with the officers until he received his bag. When Defendant made that decision, the officers terminated the interview. The bag was not produced to Defendant. While Defendant made his willingness to talk conditional, the Court finds that despite the conditional language, he ultimately invoked his right to remain silent.

Applying the Mosley factors to determine if Defendant's right to silence was scrupulously honored, the Court finds that Defendant's rights were not violated. With respect to the first Mosley factor, Investigators Thomas and O'Neal ended the interview immediately following the colloquy quoted above.

Under the second Mosley factor, we must determine whether the officers resumed questioning after the passage of a significant period of time and after providing a fresh set of Miranda warnings. In the instant case, there was approximately an hour-long interval between the two interviews. In Mosley, the Supreme Court held that an interval of more than two hours constituted "the passage of a significant period of time." 423 U.S. at 106; see also Hatley v. Lockhart, 990 F.2d 1070, 1074 (8th Cir. 1993) (two-hour interval was "significant period of time.") In United States v. Thompson, 866 F.2d at 271, a half-hour interval between questioning was considered sufficient and in United States v. Boyd, 180 F.3d 967, 977 (8th Cir. 1999), the Eighth Circuit held that statements made following a one and one-half or two-hour delay were

14

covered by previous Miranda warnings. "We of course cannot predict what length of time the Court will establish as the minimum interval necessary to satisfy the second Mosley factor," Hatley, 990 F.2d at 1074, but this Court is satisfied that the one-hour period between interviews was sufficient, particularly since this is not a case where the authorities "persisted in 'repeated efforts to wear down [the person's] resistance' in order to change the person's version of the facts." United States v. McClinton, 982 F.2d 278, 282 (8th Cir.1993) (quoting Mosley, 423 U.S. at 105-06).

Although Special Agent Malhoit did not give Defendant a complete set of fresh warnings, at the outset, he reminded Defendant that the rights he had been given earlier still applied and that he could end the interview at any time. In United States v. Cajas-Maldonado, 13 Fed. Appx. 469, 475 (8th Cir. 2001), the Eighth Circuit held that although the agent conducting a second interview of the defendant did not administer a new set of Miranda warnings, the circumstances surrounding the interview compelled the court to conclude that the defendant knowingly and intelligently waived his Miranda rights. Specifically, the court found that the interviewing agent had advised the defendant that he still possessed his Miranda rights; there was no evidence that the defendant did not understand those rights; the record from the suppression hearing reflected that the defendant understood his rights at both interviews; there was no evidence of coercion; and there was no evidence of diminished capacity. Cajas-Maldonado, 13 Fed. Appx. at 475. Similarly, in United States v. Pugh, 25 F.3d 669, 673 (8th Cir. 1994), the court held that although the defendant was not given a fresh set of Miranda warnings, the failure was immaterial because the defendant actually asserted those rights and the officers respected the assertion by terminating the interview. "A complete set of Miranda

warnings would have served Pugh no better." Id. (citing Stumes v. Solem, 752 F.2d 317, 321 (8th Cir. 1985); cert. denied, 471 U.S. 1067 (1985)).

The situation here is similar – Defendant knowingly and intelligently waived his Miranda rights prior to the initial interview. The transcript of that interview, Government Exhibit 1, reflects that Defendant unequivocally understood his rights and agreed to speak to Investigators Thomas and O'Neal. Moreover, Defendant's conduct demonstrates that he understood his rights because he exercised those very rights by terminating the first interview. Defendant is a mature adult, familiar with criminal procedures from past involvement with the criminal justice system. Defendant's conduct during the criminal motions hearing – during which time Defendant represented himself for a portion of the proceeding – demonstrates to the Court that he is self-confident and not lacking in mental capacity.

Moreover, before the second interview, Special Agent Malhoit reminded Defendant of his Miranda rights, which he had been given only about an hour earlier, and Defendant agreed to speak with him. No evidence before the Court indicates that Special Agent Malhoit knew that Defendant had previously invoked his right to remain silent. See McClinton, 982 F.2d 278, 282 (8th Cir.1993) (holding fact that second interviewer was unaware of defendant's refusal to talk in first interview supported inference that no Fifth Amendment violation occurred). The interview conducted by Special Agent Malhoit lasted approximately ten minutes.

As to the third Mosley factor, whether the topics of the interviews were different, "this Court has previously held that a second interrogation is not rendered unconstitutional simply because it involves the same subject matter discussed during the first interview." United States v. House, 939 F.2d 659, 662 (8th Cir. 1991); see also United States v. DeMarce, 564 F.3d 989,

16

994 (8th Cir. 2009); Hatley, 990 F.2d at 1074; Brown v. Caspari, 186 F.3d 1011, 1015 (8th Cir. 1999).  Here, the original interviewers focused on the robberies that had occurred that very day at the temporary agency and the credit union, as well as the robbery that occurred two days earlier at Mattress Giant.  Near the end of the interview, they briefly attempted to determine whether Defendant was involved in an earlier bank robbery in Eagan, Minnesota.  Shortly thereafter, Defendant indicated that he no longer wished to talk.

As to the second interview, Special Agent Malhoit testified that his objective was to see if Defendant was involved in other unsolved bank robberies.  During the second interview, Defendant again wanted to document the reasons why he had robbed the credit union; he also stated that he took the gun from someone else and was not involved in the unsolved bank robberies.  While there is an overlap in the subject matter of the two interviews, the federal and state investigating officers were interviewing Defendant regarding separate investigations, with the state-level investigators focusing primarily on the crimes that occurred on May 26, 2009, and the federal investigator focusing on unsolved federal crimes.  The overlap in subject matter does not render the second interview unconstitutional, as the circumstances surrounding both interviews demonstrate that Defendant's right to remain silent was honored.   There was no showing of repeated efforts by police to wear down Defendant's resistance or to induce him to abandon his earlier assertion of his right to remain silent. The first interrogation ceased immediately after he asserted his right to remain silent; the second interrogation – conducted by an agent from a different jurisdiction, with a different focus –  resumed an hour later, at which time Defendant was reminded of his Miranda rights.

Circumstances in which Courts have found a constitutional violation stand in marked

17

contrast to the facts of this case. For example, in United States v. Hernandez, 574 F.2d 1362, 1368 (5th Cir.1978), police gave Miranda warnings on up to four occasions and the defendant repeatedly invoked his right to silence. The court found that the police had not immediately ceased the interrogation once Hernandez repeatedly invoked his right to remain silent; they did not let a significant period of time pass before resuming questioning; and their interrogation continued to focus on a single crime. Under these circumstances, the court concluded the police did not scrupulously honor the defendant's right to cut off questioning, and thus his confession should have been suppressed. Id. In United States v. Olof, 527 F.2d 752 (9th Cir.1975), the defendant was arrested and after being advised of his rights under Miranda, he refused to make a statement. Knowing that the defendant had invoked his right to silence, one of the two interviewing agents present subsequently confronted Olof with an unpleasant description of federal prison as a "dark place" where they "pump air to the prisoners." Id. at 753. The two interrogations concerned the same crime, and "the object of the second interrogation was to wear down Olof's resistance and make him change his mind." Id. at 754. Intolerant of these tactics, the court held that under the Mosley criteria, Olof's right to cut off questioning had not been scrupulously honored, and his conviction had to be reversed.

     Here, the Court finds no violation of Defendant's constitutional rights. The conduct Mosley proscribes, i.e., police "either by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear down [a suspect's] resistance and make him change his mind", 423 U.S. at 105-06, did not occur here. When Defendant invoked his right to remain silent, the investigators immediately terminated the interview. The second interview was conducted by a different law enforcement officer, from a different jurisdiction, with a different

18

focus. There is no evidence of any collusion between the two sets of interviewing officers – in fact, Special Agent Malhoit did not know if he even spoke with Investigators Thomas and O'Neal prior to his interview of Defendant. Moreover, prior to the second interview, Special Agent Malhoit reminded Defendant of his Miranda rights and told him that he could end the interview at any time. Defendant, who clearly understood his rights and knew how to exercise them, agreed to speak with Special Agent Malhoit. Under these circumstances, the Court finds no constitutional violation. Defendant's motion to suppress the second statement should be denied.

**IT IS HEREBY RECOMMENDED** that:

1. Defendant's Motion to Suppress Eyewitness Identifications (Doc. No. 16) be **DENIED AS MOOT**;

2. Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Doc. No. 18) be **DENIED**; and

3. Defendant's Motion to Suppress Statements, Admissions and Answers (Doc. No. 19) be **DENIED.**

Dated: June 4, 2009

               s/Susan Richard Nelson
               SUSAN RICHARD NELSON
               United States Magistrate Judge

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court and serving all parties by **June 19, 2009**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.